04-479

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 290

MONTANA SOCIETY OF ANESTHESIOLOGISTS,
MICHAEL D. STERBIS, M.D.,

Plaintiffs and Appellants,

v.

MONTANA BOARD OF NURSING,

Defendant and Appellee,

MONTANA ASSOCIATION OF NURSE
ANESTHETISTS,

Intervenor and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. CDV 2002-710
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Mona Jamison, Roy H. Andes, Jamison Law Firm, Helena, Montana

For Appellee:

Lorraine A. Schneider, Special Assistant Attorney General,
Helena, Montana

For Intervenor and Appellee:

J. Daniel Hoven, Sara S. Berg, Chad E. Adams, Browning, Kaleczyc,
Berry & Hoven, P.C., Helena, Montana

For Amicus Curiae An Association of Montana Health Care Providers, et al.:

James Stogsdill, Kris A. Birdwell, Stogsdill Law offices, P.C., Lewistown, Montana

For Amicus Curiae Montana Medical Association:

Patrick E. Melby, Luxan & Murfitt, PLLP, Helena, Montana

Submitted on Briefs:  April 20, 2005

Decided:  November 6, 2007

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     The Montana Society of Anesthesiologists and Michael Sterbis, M.D. (collectively, "MSA") brought this action in the District Court for the First Judicial District, Lewis and Clark County, seeking to invalidate the amendments to Admin. R. M. 8.32.303 (Rule 303) made by the Board of Nursing (the BON) relating to the practice of Certified Registered Nurse Anesthetists (CRNAs) in Montana. The District Court denied MSA's Motion for Summary Judgment in the matter and MSA appealed. We affirm.

¶2     MSA raises the following issues on appeal:

¶3     1.     Whether the District Court erred in concluding that the Legislature has authorized CRNAs to administer anesthesia to patients without physician supervision.

¶4     2.     Whether administrative rules adopted by the BON which purport to allow CRNAs to administer anesthesia to patients without physician supervision comply with the Montana Constitution and the Montana Administrative Procedure Act (MAPA).

## Factual and Procedural Background

¶5     Montana law recognizes four specialty areas of nursing collectively called advanced practice registered nurses (APRNs). Section 37-8-202(2)(b), MCA. These four specialty areas of nursing include CRNAs, nurse practitioners, nurse-midwives and clinical nurse specialists. To practice in any of these four specialties requires that the individual complete additional professional education beyond the basic nursing degree required of a registered nurse and become certified in that particular specialty. For example, to practice as a CRNA, the individual must (1) have a minimum of a Bachelor of Science degree in nursing or other appropriate baccalaureate degree; (2) be licensed as

3

a registered nurse; (3) have a minimum of one year of experience in an acute care nursing setting; and (4) graduate from an accredited nurse anesthesia program at least two years in length. In addition, the individual must pass a national certification exam following graduation and complete a continuing education and recertification program every two years thereafter.

¶6 CRNAs have been the sole providers of anesthesia services in many areas of Montana, particularly in rural areas of the State, for several years. Only nine out of the forty medical facilities in Montana have an anesthesiologist on staff. CRNAs provide anesthesia services at the remaining 31 medical facilities in Montana. Of the nine facilities where an anesthesiologist is on staff, six facilities also use the services of CRNAs.

¶7 For many years, Medicare/Medicaid rules required that CRNAs must work under the general supervision of a physician when they administer anesthesia in order to obtain reimbursement for CRNA services from Medicare/Medicaid. In 2001, the Code of Federal Regulations was amended to allow the governor of each state to "opt out" of the physician supervision requirement for Medicare/Medicaid purposes if: (1) state law so allows; (2) they obtain the advice of their boards of nursing and medicine; and (3) they make a finding that opting out would be in the best interests of their state. 42 CFR § 482.52.

¶8 On September 6, 2002, Montana Governor Judy Martz requested that the BON and the Board of Medical Examiners (the BME) study the matter. Each board appointed a subcommittee of three of its members to respond to the Governor's request. A joint

4

meeting of the two subcommittees was held on November 16, 2002. Following that meeting, the committee members recommended to their respective boards that Montana opt out of the federal physician supervision requirement for CRNAs. The BON held a meeting on December 2, 2002, at which its members voted to recommend to the Governor that Montana exercise the opt-out provision. The BME held a similar meeting on December 6, 2002, and the members of the BME also voted to recommend to the Governor that Montana exercise the opt-out provision.

¶9 On January 22, 2004, the Governor notified Medicare/Medicaid that, after consulting with the BON, the BME, and "other interested and affected parties," opting out was consistent with state law and in the best interests of the citizens of Montana. Consequently, the Governor requested that Montana be exempted from the requirement that CRNAs be supervised by a physician in order to receive Medicare/Medicaid reimbursement for anesthesiology services performed by CRNAs.

¶10 Prior to the Governor's decision to opt out, the BON had taken action to amend Rule 303 concerning CRNA practice. On June 3, 2002, the BON issued a Notice of Public Hearing containing proposed amendments to Rule 303. On October 10, 2002, the BON met and adopted the amendments with a few minor changes. In its Notice of Amendment, the BON declared that it had the authority to define the scope of practice of its licensees. The amended rule was certified to the Secretary of State on November 18, 2002.

¶11 Rule 303 was amended as follows:

5

8.32.303 NURSE ANESTHETIST PRACTICE (1) Nurse anesthetist practice is the <u>independent and/or collaborative</u> performance of or the assistance in any act involving the determination, preparation, administration or monitoring of any drug used in the administration of anesthesia or related services for surgical and other therapeutic procedures which require the presence of persons educated in the administration of anesthetics.

(2) A nurse anesthetist is authorized to perform procedures delineated in the American Association of Nurse Anesthetists Guidelines for Nurse Anesthesia Practice. Copies of the guidelines may be obtained from the American Association of Nurse Anesthetists, ~~216 Higgins Road, Park Ridge, Illinois 60068, (708) 692-7050~~ <u>www.aana.com</u>. [Underlined language added and lined through language omitted.]

¶12 MSA filed its Complaint for Declaratory and Injunctive Relief on December 4, 2002, arguing that state law does not allow unsupervised delivery of anesthesia by CRNAs. MSA sought relief under the Montana Constitution and MAPA for violation of the notice and participation requirements for public meetings. MSA's claim was not grounded upon any set of facts relating to acts or omissions of CRNAs in general or any CRNA in particular.

¶13 In its Amended Complaint filed May 20, 2003, MSA alleged: (Count I) the BON violated Montana's open meeting laws by failing to provide sufficient notice of its meetings and by failing to allow the public to participate in the rulemaking process; (Count II) the BON did not have the authority to adopt the amendments to Rule 303 and thereby enlarge the scope of practice of CRNAs; and (Count III) the BON violated MAPA because it failed to provide a statement of reasonable necessity and because it attempted to adopt by reference certain guidelines for nurse anesthesia practice derived from the American Association of Nurse Anesthetists's webpage when that webpage does not actually contain the guidelines nor any link to them. Hence, MSA sought

declaratory and injunctive relief finding that the BON's opt-out recommendation to the Governor is invalid because the BON violated Montana's open meeting and public participation laws; that the BON has no statutory authority to administratively modify the scope of practice of nursing; and that the Rule 303 amendments are void and unenforceable because the BON violated MAPA in seeking to enact them.

¶14 On July 18, 2003, MSA filed its Application for Preliminary Injunction requesting that the District Court compel the BON to show cause why it should not be preliminarily enjoined pursuant to the allegations of the Amended Complaint. The court so ordered and scheduled a hearing for September 25, 2003.

¶15 The Montana Association of Nurse Anesthetists (MANA) moved to intervene in the case as an additional defendant on August 13, 2003. The District Court granted the Motion to Intervene over MSA's objection. Thereafter, MANA moved to vacate the show cause hearing set for September 25, 2003, and the court reset the hearing for October 20, 2003.

¶16 On September 10, 2003, MSA filed a Motion for Summary Judgment on Counts II and III of its Amended Complaint. Both the BON and MANA responded. MANA also cross-moved for partial summary judgment arguing that it was entitled to summary judgment as a matter of law because: (1) the BON has the authority to define the scope of practice of nursing, including that of CRNAs; (2) the administration of anesthesia by a CRNA constitutes the practice of nursing and does not constitute the practice of medicine; (3) the BON's amendments to Rule 303 clarify the scope of practice of CRNAs and do not re-define it; and (4) the Legislature has specifically declined to require

7

CRNAs to be supervised by physicians in their practice. The hearing on the show cause order commenced on October 20, 2003, with the parties arguing the summary judgment motions at the end of the hearing.

¶17 In a Memorandum and Order entered January 16, 2004, the District Court concluded that Montana law does not require physician supervision of CRNAs, thus, the court granted MANA's Cross-Motion for Partial Summary Judgment on that issue. Moreover, because the issue of physician supervision was the underpinning of Counts II and III of MSA's Amended Complaint, the court denied MSA's Motion for Summary Judgment on those claims. In addition, although the court determined that the BON did not have the authority to expand or even define the scope of practice of CRNAs, the court concluded that, in actuality, the Rule 303 amendments did not expand their scope of practice. Consequently, the court denied MSA's application for a preliminary injunction because it failed to show that the Rule 303 amendments expanded the scope of practice of CRNAs.

¶18 MSA subsequently requested that Count I of its Amended Complaint be dismissed and the court complied. MSA then appealed the District Court's denial of its Motion for Summary Judgment on Counts II and III of its Amended Complaint to this Court.

¶19 MANA filed a Motion to Dismiss this appeal contending that MSA did not appeal from a final judgment and that MSA "specifically and intentionally attempted to limit their appeal" to a review of the District Court's denial of MSA's Motion for Summary Judgment. We denied MANA's Motion to Dismiss on the basis that both MSA and MANA agreed that upon the District Court's grant of MSA's Motion to Dismiss Count I

8

of its Amended Complaint, MSA's case was fully adjudicated and that no causes of action remained before the District Court. MANA filed a Motion of Entry of Judgment to that effect and the District Court entered Judgment for MANA. In denying MANA's Motion to Dismiss, we stated that "MSA is clearly appealing from a final judgment" . . . "a judgment to which MSA and MANA both agreed."

## Standard of Review

¶20    Summary judgment is proper only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 16, 321 Mont. 432, ¶ 16, 92 P.3d 620, ¶ 16 (citing M. R. Civ. P. 56(c)). Our standard in reviewing a district court's summary judgment ruling is de novo. *Watkins Trust,* ¶ 16 (citing *Johnson v. Barrett,* 1999 MT 176, ¶ 9, 295 Mont. 254, ¶ 9, 983 P.2d 925, ¶ 9; *Stutzman v. Safeco Ins. Co. of America*, 284 Mont. 372, 376, 945 P.2d 32, 34 (1997)). We use the same M. R. Civ. P. 56 criteria applied by the district court. *Watkins Trust,* ¶ 16 (citing *Johnson,* ¶ 9). Moreover, all reasonable inferences which may be drawn from the offered proof must be drawn in favor of the party opposing summary judgment. *Watkins Trust,* ¶ 16 (citing *Johnson,* ¶ 8; *Schmidt v. Washington Contractors Group,* 1998 MT 194, ¶ 7, 290 Mont. 276, ¶ 7, 964 P.2d 34, ¶ 7). If there is any doubt regarding the propriety of the summary judgment motion, it should be denied. *360 Ranch Corp. v. R & D Holding*, 278 Mont. 487, 491, 926 P.2d 260, 262 (1996) (citing *Whitehawk v. Clark*, 238 Mont. 14, 18, 776 P.2d 484, 486-87 (1989)).

## Discussion

¶21 MANA argues on appeal that MSA's claims are moot because granting the relief requested by MSA would be a meaningless exercise since the Rule 303 amendments did not create any new rights for CRNAs, but merely clarified the prior rule and the longstanding and existing practice in Montana. Both the Montana Medical Association (MMA), an association of physicians practicing in Montana, and the Montana Health Care Association (MHA), an association of hospitals and health care providers in Montana, have filed briefs as amici curiae in this case. In its amicus brief, MHA also claims that because the Governor has already requested that Montana be exempted from the Medicare/Medicaid requirement that CRNAs be supervised by a physician, MSA's request to invalidate the amendments to Rule 303 is moot since invalidating those amendments cannot result in physician supervision of CRNAs as a prerequisite to Medicare/Medicaid reimbursement. Thus, MHA contends that this suit has lost all practical purpose and no longer presents an actual controversy.

¶22 Mootness is a threshold issue which must be resolved before addressing the underlying dispute. *Grabow v. Montana High School Ass'n*, 2000 MT 159, ¶ 14, 300 Mont. 227, ¶ 14, 3 P.3d 650, ¶ 14 (citing *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 17, 293 Mont. 188, ¶ 17, 974 P.2d 1150, ¶ 17). This Court has consistently held that "a moot question is one which existed once but because of an event or happening, it has ceased to exist and no longer presents an actual controversy." *Skinner v. Lewis and Clark*, 1999 MT 106, ¶ 12, 294 Mont. 310, ¶ 12, 980 P.2d 1049, ¶ 12 (quoting *State ex rel. Miller v. Murray*, 183 Mont. 499, 503, 600 P.2d 1174, 1176 (1979)). Moreover, a case will become moot for the purposes of an appeal "where by a

change of circumstances prior to the appellate decision the case has lost any practical purpose for the parties, for instance where the grievance that gave rise to the case has been eliminated . . . ." *Matter of T.J.F.*, 229 Mont. 473, 475, 747 P.2d 1356, 1357 (1987) (quoting 5 Am. Jur. 2d *Appeal and Error* § 762 (1962)).

¶23    Contrary to MANA's and MHA's contentions in this case, even though the question of whether Montana should opt out of the Medicare/Medicaid requirement that CRNAs be supervised by a physician may no longer be at issue, not all patients are Medicare/Medicaid patients.  Consequently, this case has not lost all practical purpose for the parties and the questions of whether CRNAs are authorized by Montana law to administer anesthesia without physician supervision and whether the BON has the authority to re-define the scope of practice of CRNAs, still present an actual controversy.

¶24    Furthermore, under the Medicare/Medicaid regulations, the Governor may only opt out if each of three conditions are met, one of which is that the opt out complies with state law.  Thus, if this Court determines that Montana statutes do not allow CRNAs to practice independently, one of the conditions underlying the opt out fails.

**Issue 1.**

¶25    *Whether the District Court erred in concluding that the Legislature has authorized CRNAs to administer anesthesia to patients without physician supervision.*

¶26    MSA contends on appeal that the District Court erred in denying its Motion for Summary Judgment because the Legislature has not authorized CRNAs to administer anesthesia to patients without physician supervision.  MSA asserts that administering anesthesia is "clearly a form of medical 'diagnosis' and 'treatment' " and nurses,

11

including CRNAs, may not engage in diagnosis and treatment pursuant to the Medical Practice Act (Title 37, Chapter 3 of the Montana Code Annotated). However, MSA has failed to set forth any provision in Montana law requiring CRNAs to be supervised by a physician. Instead, MSA relies on numerous Attorney General opinions to support its position, none of which are on point.

¶27 In addition, the MMA argues in its amicus brief that the level of supervision anticipated does not involve the surgeon instructing the CRNA on just how anesthesia should be administered as the surgeon does not exercise control over the "means and method" used by CRNAs in administering anesthesia. Rather, according to the MMA, the supervision involves the responsibility of the physician to ensure that the proper decisions regarding patient care are made in the operating room; that the CRNA is competent, qualified and mentally alert; and that the CRNA keeps the surgeon informed of any changes the CRNA may detect in the patient's status. However, it could be argued that a surgeon would require the exact same things from an anesthesiologist.

¶28 Under § 37-3-102, MCA, a person may not practice medicine unless that person possesses a license to practice medicine or is exempt from the licensing requirements. To that end, § 37-3-102(8), MCA, defining the practice of medicine, provides:

> "Practice of medicine" means the diagnosis, treatment, or correction of or the attempt to or the holding of oneself out as being able to diagnose, treat, or correct human conditions, ailments, diseases, injuries, or infirmities, whether physical or mental, by any means, methods, devices, or instrumentalities. If a person who does not possess a license to practice medicine in this state under this chapter and who is not exempt from the licensing requirements of this chapter performs acts constituting the practice of medicine, the person is practicing medicine in violation of this chapter.

However, § 37-3-103(1)(i), MCA, provides that the Medical Practice Act does not apply to "the rendering of nursing services by registered or other nurses in the lawful discharge of their duties as nurses . . . under the conditions and limitations defined by law."

¶29     The "conditions and limitations defined by law" referred to in § 37-3-103(1)(i), MCA, are set forth in the Nurse Practice Act (Title 37, Chapter 8 of the Montana Code Annotated).  And, the section of the Nurse Practice Act that refers to CRNAs provides, in pertinent part, as follows:

> **Advanced practice registered nursing – when professional nurse may practice.** (1) A person licensed under this chapter who holds a certificate in a field of advanced practice registered nursing *may practice in the specified field of advanced practice registered nursing* upon approval by the board of an amendment to the person's license granting a certificate in a field of advanced practice registered nursing. The board shall grant a certificate in a field of advanced practice registered nursing to a person who submits written verification of certification by a board-approved national certifying body appropriate to the specific field of advanced practice registered nursing and who meets any other qualification requirements that the board prescribes.

Section 37-8-409, MCA (emphasis added).

¶30     Consequently, pursuant to the provisions of §§ 37-3-102(8) and 37-3-103(1)(i), MCA, nurses are exempt from the Medical Practice Act as long as they render nursing services in the lawful discharge of their duties as nurses under the conditions and limitations defined by the Nurse Practice Act.  And, more specifically, under § 37-8-409, MCA, of the Nurse Practice Act, CRNAs may practice in their specified field (anesthesia) as long as they meet the licensing and qualification requirements for a CRNA.

13

¶31  The Montana Legislature authorized nurse anesthetist practice in 1981 when it reestablished the Board of Nursing and generally revised the laws relating to licensure of nurses.  Sec. 7, Ch. 248, L. 1981.  The Legislature did not see fit at that time to require that CRNAs be supervised by a physician, nor has the Legislature ever required that CRNAs be supervised by a physician.  The only supervision requirement in § 37-8-409, MCA, is found at subsection (4) and pertains to individuals granted temporary approval to practice as a CRNA while they await the results of their national certification examination.  Section 37-8-409(4), MCA.  Had the Legislature intended that all CRNAs be supervised by a licensed physician, it could easily have required so.

¶32  And, in fact, in such instances where the Legislature intended to require supervision, it has done so expressly.  For example, § 37-3-104, MCA, specifically requires that a medical assistant[1] be supervised by a physician or a podiatrist and that the physician or podiatrist may be held responsible for any acts of or omissions by medical assistants acting in the ordinary course and scope of their assigned duties.  Similarly, § 37-8-102(7)(a), MCA (2005), requires that practical nursing services[2] must be "performed under the supervision of a registered nurse or a physician, dentist, osteopath, or podiatrist authorized by state law to prescribe medications and treatments."  Section

---

[1]  Section 37-3-102(6), MCA, defines a "medical assistant" as "an unlicensed allied health care worker who functions under the supervision of a physician or podiatrist in a physician's or podiatrist's office and who performs administrative and clinical tasks."

[2]  Section 37-8-102(7)(a), MCA, defines the "practice of practical nursing" as "the performance of services requiring basic knowledge of the biological, physical, behavioral, psychological, and sociological sciences and of nursing procedures."

37-20-301(1)(a), MCA, specifically requires that a physician assistant[3] be supervised by a physician licensed in this state. Moreover, § 37-20-403, MCA, provides that a physician assistant is an agent of the physician and the duties of the physician assistant are delegated by the physician. No similar laws establish a supervisory or agency relationship between a CRNA and a physician.

¶33 Moreover, the Legislature has specifically rejected attempts to bring CRNAs within the ambit of § 37-3-102, MCA. During the 2003 legislative session, Representative Daniel Fuchs introduced House Bill No. 590 (HB 590). This bill was entitled "An Act Providing for Supervision of a Certified Registered Nurse Anesthetist in the Administration of Anesthesia." Section 1 of HB 590 specifically required:

> Administration of anesthesia by a certified registered nurse anesthetist in relation to a surgical procedure must be under the supervision of: (1) an anesthesiologist who is immediately available if needed; (2) a medical practitioner licensed under Title 37, chapter 3, 5 or 6; or (3) a dentist licensed under Title 37, chapter 4.

HB 590 was ultimately withdrawn by its sponsor.

¶34 Also during the 2003 legislative session, MSA attempted to amend Senate Bill No. 331 (SB 331) ("An Act Generally Revising the Laws Applying to the Practice of Nursing . . . .") to include a supervision requirement. Both proponents and opponents of SB 331 testified before a full hearing of the House Human Services Committee. Following the receipt of various public comments and communications, the committee

---

[3] Section 37-20-401(3), MCA, defines a "physician assistant" as "a member of a health care team, licensed by the [BME], who provides medical services that may include but are not limited to examination, diagnosis, prescription of medications, and treatment under the supervision of a physician licensed by the [BME]."

voted 13 to 0 to reject the amendments. The committee chair, Representative Bill Thomas, wrote a letter to the Governor regarding the proposed amendment wherein he stated:

> As a result of a lengthy hearing, the prominent message was evident; physician supervision of CRNAs is <u>not</u> in the best interest of Montana. The committee emphasized that message by unanimously opposing the amendment requiring supervision.

¶35 In short, the Legislature, the governmental body MSA argues should make any scope of practice decisions, declined the opportunity to impose on CRNAs the supervision requirements MSA has requested that this Court create. *See Continental Oil Co. v. Board of Labor Appeals*, 178 Mont. 143, 153-54, 582 P.2d 1236, 1242-43 (1978) (noting that although the 1977 Montana Legislature had an opportunity to amend Montana's unemployment compensation statutes to delete the phrase "stoppage of work" and insert in its place the word "strike," the Legislature declined to do so. This, the Court stated, was supportive of the view that the Legislature did not consider the phrase "stoppage of work" to be synonymous with the word "strike."); *Berry v. KRTV Communications, Inc.*, 262 Mont. 415, 428, 865 P.2d 1104, 1113 (1993) (Larson, D.J., sitting for Nelson, J., specially concurring) (noting that although the Legislature had ample opportunity in the six times it had amended § 39-3-406, MCA, since 1981, to exclude news editors from that statute's overtime pay provisions, the Legislature declined to do so, and "[t]he only possible conclusion is that the Legislature has specifically decided *not* to exclude news editors in small cities *from coverage* by the Montana overtime pay provisions.").

¶36 We have repeatedly stated that we will not insert language into a statute that was omitted by the drafters. When interpreting statutes, our role "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. "In doing so, we must pursue the intent of the Legislature and that intent is determined by interpreting the plain meaning of the language used." *Saari v. Winter Sports, Inc.*, 2003 MT 31, ¶ 22, 314 Mont 212, ¶ 22, 64 P.3d 1038, ¶ 22 (citing *In re R.L.S.,* 1999 MT 34, ¶ 8, 293 Mont. 288, ¶ 8, 977 P.2d 967, ¶ 8).

¶37 Furthermore, this Court has routinely stated that the interpretation by administrative boards over statutes under their respective domains should be given deference. *Montana Power Co. v. Public Service Com'n*, 2001 MT 102, ¶¶ 23-25, 305 Mont. 260, ¶¶ 23-25, 26 P.3d 91, ¶¶ 23-25; *Sleath v. West Mont Home Health Services*, 2000 MT 381, ¶ 37, 304 Mont. 1, ¶ 37, 16 P.3d 1042, ¶ 37, *cert denied by Dow AgroSciences LLC v. Sleath*, 534 U.S. 814, 122 S. Ct. 40 (2001); *Dept. of Revenue v. Kaiser Cement Corp.*, 245 Mont. 502, 507, 803 P.2d 1061, 1064 (1990). In this case, not only has the BON, the administrative board regulating the practice of CRNAs, declared that physician supervision is not required for CRNAs, but the BME, the regulatory board responsible for proscribing the unlicensed practice of medicine, concluded that physician supervision of CRNAs is not required because nurse anesthetist practice is not the practice of medicine.

¶38 Accordingly, we hold that the District Court was correct in concluding that the Legislature has authorized CRNAs to administer anesthesia to patients without physician

supervision.

## Issue 2.

¶39    *Whether administrative rules adopted by the BON which purport to allow CRNAs to administer anesthesia to patients without physician supervision comply with the Montana Constitution and MAPA.*

¶40    The District Court determined that because the Legislature has not authorized the BON to promulgate rules defining the scope of practice of CRNAs, the BON does not have the authority to pass any rule that may go beyond what is set forth in the statutes. In this case, however, because the court had already determined that Montana law does not require physician supervision of CRNAs, it concluded that the BON's amendments to Rule 303 did not change or re-define the scope of practice of CRNAs. Hence, the court granted MANA's Motion for Partial Summary Judgment and denied MSA's Motion for Summary Judgment.

¶41    MSA now contends on appeal that the District Court erred in denying its Motion for Summary Judgment because the BON's amendments are an "executive usurpation of legislative power by an unelected executive body." Similarly, the MMA argues in its amicus brief that the BON did not have the authority to adopt an administrative rule allowing CRNAs to practice independently of physician supervision.

¶42    MANA asserts on the other hand that prior to the amendments to Rule 303, the rule did not contain any requirement for physician supervision of CRNAs, thus the amendments to the rule did not re-define the scope of practice of CRNAs, nor did they create any new authorization for CRNAs to administer anesthesia without physician supervision.

18

¶43    An administrative agency can exercise only those powers specifically conferred on it by the Legislature. *Bell v. Dept. of Licensing*, 182 Mont. 21, 22, 594 P.2d 331, 332 (1979).

> The courts have uniformly held that administrative regulations are out of harmony with legislative guidelines if they: (1) engraft additional and contradictory requirements on the statute; or (2) if they engraft additional, noncontradictory requirements on the statute which were not envisioned by the legislature.

*Bell*, 182 Mont. at 23, 594 P.2d at 333 (internal citations and quotation marks omitted).

¶44    To that end, § 37-1-131(1), MCA, provides that each board within the Department of Labor and Industry shall set and enforce standards and rules governing the licensing, certification, registration and conduct of the members of the particular profession or occupation within its jurisdiction.

¶45    The "scope of practice" for CRNAs in Montana, as established by the Legislature, is the breadth of the professional practice for which the CRNA is licensed. It entails the administration of anesthesia services by duly qualified and certified professional nurses licensed by the BON in that advanced practice specialty field. The license is the CRNAs authorization to practice in that specialty field and is evidence of the licensee's competence to do so.

¶46    A CRNA may not practice outside the "scope" of his or her license by, for example, providing nurse midwifery services to patients or by acting as a nurse practitioner. Nor may a CRNA practice medicine by performing surgery on a patient. But a licensed CRNA is authorized under § 37-8-409(1), MCA, to practice in the nurse

anesthetist field of advanced practice registered nursing by providing anesthesia services to patients.

¶47 The cases cited in MSA's brief in support of its position that CRNAs are practicing outside of their scope of practice are not on point. All of these cases are criminal cases wherein the individuals were prosecuted, not for practicing outside the scope of their license, but rather, for practicing without a license or using a title reserved to the holders of a particular license. There are no allegations in this case of any particular CRNA performing any particular practice or procedure outside the scope of what the Legislature has allowed and what the CRNA's license authorizes them to perform.

¶48 We agree with the District Court that the Legislature has not provided the BON with the authority to re-define or expand the scope of practice established by the CRNA's enabling legislation. We also agree with the District Court that the BON's amendments to Rule 303 did not re-define or expand the scope of practice of CRNAs. Instead, amending the statute to include the phrase "administrative and/or collaborative" merely clarified the existing practice of CRNAs in Montana.

¶49 MSA also contends that the BON violated MAPA when it amended Rule 303 because it failed to provide a statement of reasonable necessity as required by § 2-4-305, MCA, and it improperly attempted to adopt by reference the AANA guidelines.

¶50 Section 2-4-305(6)(b), MCA, provides, in pertinent part:

> The agency shall also address the reasonableness component of the reasonable necessity requirement by, as indicated in 2-4-302(1) and subsection (1) of this section, *stating the principal reasons and the*

20

*rationale for its intended action* and for the particular approach that it takes in complying with the mandate to adopt rules. Subject to the provisions of subsection (8), *reasonable necessity must be clearly and thoroughly demonstrated for each adoption, amendment, or repeal of a rule* in the agency's notice of proposed rulemaking and in the written and oral data, views, comments, or testimony submitted by the public or the agency and considered by the agency. A statement that merely explains what the rule provides is not a statement of the reasonable necessity for the rule. [Emphasis added.]

In its June 3, 2002 "Notice of Public Hearing on Proposed Amendment," the BON

provided the following reason for amending Rule 303:

REASON: Section 37-8-202, MCA, gives the [BON] the authority to "define the educational requirements and other qualifications applicable to recognition of advanced practice registered nurses." The rule is implementing the same statute. The [BON] proposed the rule amendment because of a meeting between the [BON] and the [Board of] Pharmacy. The Board of Pharmacy believes that when an anesthetist performs anesthesia, s/he is prescribing an anesthetic. Because the nurse anesthetist is prescribing, the CRNA must have prescriptive privileges for the [BON] to assure the public safety. Prescribing involves choosing the appropriate drug for the individual patient, determining the therapeutic dose, administering the drug, and being alert for complications or adverse reactions while the patient is under the influence of the drug. Additionally, many CRNAs practice in areas other than anesthesia, such as pain control. The current rule for CRNAs makes prescriptive authority optional. Approximately 20% of all CRNAs have prescriptive privileges in Montana. For the last two years, the [BON] encouraged all CRNAs to apply for prescriptive privileges voluntarily. The rule will affect all CRNAs and future CRNAs in Montana. Currently, Montana has 141 CRNAs, and approximately 116 of them will need to apply for prescriptive authority when the rule is adopted. The [BON] will allow a period of nine months for those who do not have prescriptive authority to apply and receive approval.

Nowhere in this statement does the BON refer to the independent practice of CRNAs.

Instead, it deals solely with the prescriptive authority or lack thereof of CRNAs.

21

¶51 The BON readily admits that this statement was defective and thus did not fully comply with § 2-4-305(6)(b), MCA, but the BON argues that since these amendments to Rule 303 were not substantive, compliance with § 2-4-305(6)(b), MCA, was not necessary. The BON states that they believed the substantive change in Rule 303 was the addition of a new subsection requiring CRNAs to have prescriptive authority. Hence, although the BON did indicate in their "Notice of Public Hearing on Proposed Amendment" that the language regarding the independent practice of CRNAs would be added to Rule 303, the statement of reasonable necessity accompanying the proposed amendments to Rule 303 only referred to the reasons for requiring CRNAs to have prescriptive authority.

¶52 MAPA provides: "A rule is not valid unless notice of it is given and it is adopted *in substantial compliance* with 2-4-302, 2-4-303, or 2-4-306 and *this section . . . .*" Section 2-4-305(7), MCA (emphasis added). In *In re Rudd's Estate*, 140 Mont. 170, 177, 369 P.2d 526, 530 (1962), this Court stated that "substantial compliance means only that a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which it was adopted." The intent or purpose of MAPA is "to give notice of governmental action and the opportunity to express one's opinion regarding that action." House Joint Resolution No. 2 (adopted by the 49th Legislature of the State of Montana) (March 9, 1985).

¶53 In this case, not only did MSA have notice of the BON's intent to amend Rule 303, representatives of MSA and MMA were allowed to observe and participate in the amendment process by attending the July 3, 2002 public hearing and by voicing their

22

objections to the amendments to Rule 303. The BON's "Notice of Amendment" regarding Rule 303, certified to the Secretary of State on November 18, 2002, indicated that the following individuals appeared at the public hearing and voiced their objections to the amendments: Susan Good for MSA, the Montana Neurosurgeons, and the Montana Orthopedic Society; Mona Jamison for MSA; Patrick Melby for MMA; and G. Brian Zins for MMA. Consequently, the intent for which MAPA, and more specifically § 2-4-305(6), MCA, was adopted, was sufficiently carried out in this case.

¶54 In addition, in Count I of its Amended Complaint, MSA argued that the BON violated Montana's open meeting laws by failing to provide sufficient notice of its meetings wherein the amendments to Rule 303 were to be discussed, and by failing to allow the public to participate in the rulemaking process by attending those meetings. However, after it was shown that MSA did receive notice of the meetings and actually had representatives at the meetings who voiced their objections to the amendments, MSA requested that this Count be dismissed.

¶55 Therefore, although the BON did not fully comply with § 2-4-305(6)(b), MCA, in that it failed to provide a statement of reasonable necessity regarding the addition of the phrase "independent and/or collaborative" to Rule 303, the BON "substantially" complied by putting MSA and the public in general on notice of the Rule 303 amendments and thereby permitted observation of and participation in the amendment process.

¶56 We also are not persuaded by MSA's argument that the BON violated MAPA because it improperly attempted to adopt by reference the AANA guidelines. The AANA

23

guidelines had been adopted long before the amendments to Rule 303. The amendments merely substituted a website address for a street address. That portion of Rule 303, before and after the amendment, states as follows:

> A nurse anesthetist is authorized to perform procedures delineated in the American Association of Nurse Anesthetists Guidelines for Nurse Anesthesia Practice. Copies of the guidelines may be obtained from the American Association of Nurse Anesthetists, ~~216 Higgins Road, Park Ridge, Illinois 60068, (708) 692-7050~~ www.aana.com. [Underlined language added and lined through language omitted.]

¶57 A plain reading of the language in the Rule that "copies of the guidelines may be obtained from" the AANA does not state that the guidelines are available on the website itself, but that the guidelines can be obtained by contacting the AANA at the website address and requesting a copy of the guidelines.

¶58 Accordingly, we hold that the amendments to Rule 303 did not re-define or expand the scope of practice of CRNAs, nor did they violate MAPA.

¶59 Affirmed.

/S/ JAMES C. NELSON

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE